INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL No. 35 *v.* COMMISSION ON CIVIL RIGHTS

SUPERIOR COURT     HARTFORD COUNTY     FILE No. 90351

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL No. 35 *v.* COMMISSION ON CIVIL RIGHTS

SUPERIOR COURT     HARTFORD COUNTY     FILE No. 90352

Memorandum filed July 14, 1952.

*Harold Strauch,* of Hartford, for the Plaintiff.

*George C. Conway,* Attorney General, and *Raymond J. Cannon,* Assistant Attorney General, of Hartford, for the Defendant.

BORDON, J. Section 7400 of the General Statutes provides for the appointment of a commission on civil rights, one of whose duties shall be the investigation of discrimination in employment. Sections 7401-07 comprise the Connecticut Fair Employment Practices Act, adopted in May 1947. This act, like the fair employment practices legislation of other states, designates discrimination against a prospective or present employee by an employer, an employment agency or a labor organization, "because of the race, color, religious creed, national origin or ancestry," as "an unfair employment practice." § 7405. It explicitly proscribes exclusion from full membership rights by a labor organization, unless such exclusion is based on a "bona fide occupational qualification." § 7405 (c). The commission on civil rights

is given power to investigate complaints of unfair practices, to hold hearings on such complaints and to issue appropriate orders based on written findings of fact. Such orders may be reviewed in the courts and enforced by a court decree. § 7407.

The cases at bar were commenced by complaints filed on July 1, 1950, with the commission on civil rights. After investigation and unsuccessful attempts at conciliation and persuasion, a hearing on both complaints was commenced on March 26, 1951, before a hearing tribunal of the commission. It was continued on various days thereafter and terminated on May 15, 1951. At the conclusion of the hearing, the tribunal found as follows: Complainants are Negroes and honorably discharged veterans of World War II. Both did electrical work while in the armed forces and both subsequently attended the Hartford Trade School, where they took courses in electrical work. Together they made application for admission to the union in April of 1949. The business manager of the union told them that there was a long waiting list but gave them each application blanks, which complainants thereafter filed. One of the complainants, Tilley, appeared before the executive board of local 35 in April of 1949 to inquire about his application; he was informed that the union was not admitting any more men at that time because work was slow. The union never took any action on the complainants' applications and never informed them of any reason for its inaction. During this same period, it admitted several white applicants who, it claims, are either relatives or friends of union members.

The tribunal also found that the union has never admitted any Negroes, although it has from time to time received applications from qualified Negro electricians. Some years ago, the union, operating under a closed shop contract, compelled an employer to

downgrade a Negro electrician to a janitorial position, so as to be relieved of the obligation of admitting him as a member. The union has substantial control over the labor market for electricians in the Hartford area, since most of the substantial electrical contractors in the area are unionized.

The tribunal concluded that the union had committed an unfair employment practice in discriminatorily excluding the complainants because of their race from full membership rights. The commission therefore issued orders commanding the union—if the complainants presented themselves for admission for membership—to "cease and desist from excluding" them "from full membership rights because of . . . race" and to "cease and desist from failing or refusing to act both by their Executive Board and by their membership" on complainants' applications.

The union thereupon took this appeal to the Superior Court pursuant to § 7407 of the General Statutes.

The court has read more than 1400 pages of testimony as well as the briefs filed by the parties. The challenging question presented by the proceeding is whether the court can arrive at its own conclusions, after reading the evidence, or is required to accept those of the hearing tribunal. Section 7407 (b) provides that the findings of the hearing tribunal as to the facts shall be conclusive "if supported by substantial and competent evidence." In the opinion of the court the finding of discrimination is based on inferences, some of which are not justified. The evidence in support of discrimination lacks proof of overt acts directed exclusively against Negroes. There was also obvious discrimination against white applicants in order to protect the economic security of union members. Although § 7405 (c) defines an unfair labor practice as one where a labor organiza-

tion excludes from its membership any applicant because of his race, color, religious creed, national origin or ancestry, it is doubtful if any of the above categories, other than color, would have aroused the hearing tribunal to the decision arrived at in the instant case. There is a greater tendency to suspect improper motives where Negoes are involved because of traditional cruel and ruthless prejudice and discrimination directed against them throughout the years. Nevertheless, the finding of the tribunal is conclusive only if supported "by substantial and competent evidence."

The union claims, with some justification, that the tribunal's finding should be overturned by the court. The court's function is, however, circumscribed by the statute and it cannot substitute its own conclusion for that of the tribunal. A decision in this type of proceeding cannot be based on what the court would have done. The court is to determine whether the tribunal acted arbitrarily, unreasonably, or contrary to law. If competent evidence before the tribunal is susceptible of an interpretation which accords with their decision, the court must accept it even though it would have come to a different conclusion on the evidence. The court cannot substitute its own discretion for that reposed by statute in the tribunal. *Lanyon* v. *Administrator,* 139 Conn. 20; *General Motors Corporation* v. *Mulquin,* 134 Conn. 118; *New Haven Metal & Heating Supply Co.* v. *Danaher,* 128 Conn. 213; *Almada* v. *Administrator,* 137 Conn. 380; *Draper* v. *Clark Dairy, Inc.* (Superior Court, New Haven County, No. 73800). It may go no further than to determine whether the tribunal acted unreasonably, arbitrarily or illegally. *Hoffman* v. *Kelly,* 138 Conn. 614; *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175; *Colonial Beacon Oil Co.* v. *Zoning Board of Appeals,* 128 Conn. 351.

Racial prejudice or discrimination is intangible and elusive and can be established only through inference. It is not a packaged item which carries a label describing its contents, which may be exposed to public view by analysis. It is essentially subjective in character, with its roots and symptoms buried within the recesses of heart and mind. One who indulges in discrimination does not shout it from the house tops. He does not make a public announcement expressly stating his attitude or objectives. In fact he conceals his true feelings by publicly announcing contrary views. All too frequently persons publicly announce abhorrence of racial prejudice while privately practicing it. For this reason, in this type of proceeding, greater latitude is accorded the tribunal to draw inferences from words or deeds than in cases where overt acts need to be established. *F. W. Woolworth Co.* v. *National Labor Relations Board,* 121 F.2d 658, 660.

In the instant case, Devine's attitude towards the applicants in question may spell out discrimination. His effort to discourage the filing of applications, and his statements to Kanell that Negroes make bad union members may well reflect the true and unspoken policy of the union to exclude Negroes from membership. This policy may be further evidenced by the fact that while they were being excluded white applicants were taken in, and that no Negroes have ever been admitted to union membership although applied for. Similar treatment of Negroes in other instances may likewise have been considered by the tribunal in arriving at its decision. The case of Silas Hill may well disclose the union's attitude as far back as 1946. Hill, who graduated from college as an electrical engineer, was employed by Bauer & Company as an apprentice when the company was nonunion. He worked in this capacity for more than two years. Bauer & Company decided to go union

because substantial electrical contracts were currently available only to union firms. Upon application to the union, all of Bauer's employees were admitted except Hill. He was removed from his regular duties and given an inside job as janitor. It is now claimed that this was done because of his incompetency. And yet for more than two years he had, apparently, rendered satisfactory service as an apprentice. Surely here was direct evidence of discrimination. When all of the above facts are pieced together the unspoken policy may be even more eloquently expressed than oral or written pronouncements.

The union claims that it can accept apprentices only when sponsored by an employer. The applicants in question were not so sponsored. They could not obtain employment with a union firm. That means, in effect, that they could never get into the union because they never could get jobs. It is a vicious circle which excludes Negroes from employment as well as union membership. And yet, employer and union alike can, by this device, plead freedom from discrimination, while actually practicing it.

The union claims that the complaints should be dismissed because they were filed more than six months after the alleged acts of discrimination, contrary to § 7406. Applications for membership were filed April 1, 1949, and complaints with the commission on civil rights filed July 1, 1950, clearly more than six months after the filing of applications. In this type of case the running of the limitation statute cannot begin until the discrimination is established. It differs from a case in which the time of alleged discrimination can be definitely fixed. For instance, where an employer advertises for help and a Negro, who responds, is refused employment, the time of alleged discrimination is fixed by such refusal. But admission to a union must take time; sometimes as

long as a year. The discriminatory act cannot be fixed until it becomes apparent from the conduct of the union that it is discriminating. For this reason it may be that the applicants concluded on July 1, 1950, that their applications were not being considered because they were Negroes. And when they reached that conclusion, they filed complaints.

From all the evidence before the hearing tribunal, it is found that there was no abuse of discretion, and that the tribunal did not act arbitrarily, unreasonably or illegally.

The appeal is dismissed in each case. And it is ordered that the appellant carry out the orders of the commission on civil rights as contained in the orders of the hearing panel.